## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **No. 1:21-CR-00044-CJN** |
| **DANIEL D. PHIPPS,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.   For the reasons set forth herein, the government requests that this Court sentence defendant Daniel Dink Phipps to a prison term of 33 months followed by a supervised release term of three years, and order him to pay restitution in the amount of $2000 and mandatory special assessments totaling $270.   The government's recommendation of 33 months' incarceration is at the upper end of the applicable Sentencing Guidelines range.

## I.     INTRODUCTION

The defendant, Daniel Phipps, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that interrupted the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05.   That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.   The D.C. Metropolitan Police Department (MPD) also suffered losses, and is also a victim.   MPD recently submitted a total of approximately $629,056 in restitution amounts, but

Phipps, with numerous other rioters, approached the Capitol on foot that day from the west and made his way onto the West Terrace.   Along with other rioters, he first tried one doorway into the Capitol but was repulsed by police.   Undeterred, a few minutes later, at 3:01 p.m., he and other rioters successfully entered the Capitol through the Senate Wing doorway.

Phipps remained in the building until 3:27 p.m., when he exited through the Senate Wing doorway back onto the West Terrace.   Upon exiting the building, Phipps remained on the West Terrace for over an hour.   At approximately 4:30 p.m., a line of D.C. Metropolitan Police Department (MPD) officers began moving across the terrace, instructing Phipps and the numerous other rioters still present to leave.   Phipps violently resisted the officers' efforts, pushing and shoving three officers in particular--MPD Officer A.C., MPD Officer K.R., and a third MPD officer who has not been identified--in distinct and separate acts of assault.   During these assaults Phipps threatened the entire group of officers, telling them:   "You know this isn't the end.   You know this isn't over.   This is just the beginner [sic].   This is just the beginning!"

Phipps was later charged in a Second Superseding Indictment with six counts relating to his conduct during the riot:   Count One:   Assaulting, Resisting or Impeding Certain Officers (MPD Officer A.C.), with Physical Contact and Intent to Commit Another Felony, in violation of 18 U.S.C. § 111(a)(1); Count Two:   Obstructing, Impeding, or Interfering with a Law Enforcement Officer (MPD Officer A.C.) During a Civil Disorder, in violation of 18 U.S.C.

---

the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum.   Nonetheless, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

§ 231(a)(3);[2]  Count Three:   Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); Count Four:   Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); Count Five:   Disorderly Conduct on Capitol Grounds or in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and Count Six:   Parading, Demonstrating and Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).   Phipps has pleaded guilty to all six counts without the benefit of a plea agreement.

The government recommends that the Court sentence Phipps to 33 months' incarceration, which is at the top of the advisory Guidelines' range of 27 to 33 months.   A 33-month sentence reflects the gravity of Phipps's conduct on January 6.   Phipps ignored the repeated commands of police to move off of the West Terrace.   Phipps assaulted three separate police officers who were facing off with a violent mob and struggling to move Phipps and other rioters off the West Terrace.   Only after a third assault did Phipps reluctantly leave the West Terrace.   Two days later he boasted of his actions, proudly claiming that he "helped take the Hill."

## II.   FACTUAL BACKGROUND

### A.   The January 6, 2021 Attack on the Capitol

The U.S. Capitol Building is located at First Street, S.E., in Washington, D.C.   It is secured 24 hours a day by the United States Capitol Police (USCP).   Restrictions around the Capitol include permanent and temporary security barriers and posts manned by USCP officers.

---

[2]At the time of the grand jury presentation for the Second Superseding Indictment, the various video evidence showing that Phipps had assaulted two officers in addition to Officer A.C. had not been fully isolated and reviewed.   Accordingly, Phipps was only charged with one assault and one violation of § 231, both tied to Officer A.C.   However, as explained in detail below, Phipps committed three distinct assaults against MPD officers.

Only authorized people with appropriate identification are allowed inside the Capitol.   On January 6, 2021, the grounds around the Capitol, and the various plaza areas immediately outside the building, including the West Terrace, were also closed to members of the public.   As the day began, the exterior doors and windows of the building were locked or otherwise secured.

At approximately 1:00 p.m. a joint session of the United States Congress convened in the Capitol, in the chamber of the House of Representatives and with Vice President Mike Pence presiding, in order for members of the House and Senate to certify the Electoral College vote count for the 2020 presidential and vice-presidential elections.   At approximately 1:30 p.m., the joint session adjourned in order for House members and Senators to meet as separate bodies, in their respective chambers, to resolve a particular objection made during the joint session.

As the proceedings continued in both the House and the Senate, and with Vice President Pence presiding over the Senate, a large crowd gathered outside the Capitol.   As noted above, temporary and permanent barricades were in place around the exterior of the building, and USCP members were attempting to keep the crowd away from the building.   However, shortly after 2:00 p.m., several individuals in the crowd forced their entry into the Capitol, by breaking windows and by assaulting USCP members, with numerous others in the crowd encouraging and assisting the assailants.

Due to the incursion, at approximately 2:20 p.m., the USCP instructed the House members and Senators, along with the Vice President, to evacuate both chambers and the Capitol building.   Over the next few hours numerous persons unlawfully in the Capitol vandalized various offices and assaulted and threatened USCP officers.   Some of the attackers penetrated into the Senate chamber while others attempted to get into the House chamber, where several

4

representatives—who were not able to immediately evacuate—were huddled under the protection of USCP members.

Although he evacuated from the Senate Chamber, Vice President Pence remained in the Capitol, under the protection of USCP members and members of the U.S. Secret Service.

After several hours, USCP members, with the assistance of MPD and members of other law enforcement agencies, were able to clear the building and the surrounding grounds of rioters. The certification proceedings were not able to resume until approximately 8:00 p.m., and were not completed until the early morning hours the next day, on January 7, 2021.

**B.      Phipps's Role in the January 6, 2021 Attack on the Capitol**

1.   <u>Phipps refused to accept the outcome of the election prior to January 6.</u>

In the months leading up to the attack, Phipps resided in Garland, Texas, and worked in the area as a security guard.   As shown in his Facebook account postings, Phipps supported Donald Trump's re-election as president.   This was clear from his post on the morning of November 3, 2020, election day, when he stated:   "I voted for the pro America candidates. TRUMP LANDSLIDE 2020!   RED WAVE 2020!"

His celebratory tone soon changed, however, when he realized his preferred candidates might not have won.   About twelve hours after the above post, he posted this message:   "I'm

completely disgusted by the amount of blue in Texas.    Fuck all y'all that moved your libtard

votes here.    Seriously, fuck all y'all."

Over the next few days, Phipps's posts became more strident and militant, and included

implied, but nonetheless clear, calls for violence.    On November 5, 2020, he posted the

following messages:

> We are witnessing a coupe [sic, coup].    Biden said on video they
> had a massive voter fraud scheme in play.    We all watched it.
> THIS NOT A DRILL!   THIS IS A DEEP STATE  COUPE [sic]!
> THIS IS A CALL TO ACTION!   Rally up.    Get organized.
> What is our first collective plan of action?
>
> I'll say it.    VOTER FRAUD!!!
>
> The chair is against the wall, Patriots.    We are in the midst of a
> coup.    Rampant voter fraud.

The next day, November 6, 2020, he posted this message:

> What are we going to do?    I'm not asking for for [sic] armed
> marches or anything else like that.    But I think we should
> organise [sic] and do something to show our numbers and support
> for Trump during this coupe [sic].    And make no mistake, we are
> witnessing a deep state coupe [sic].    Our Constitutional
> Republic's democratic process had been subverted and our votes
> corrupted by a non-elected bureaucratic deep state.    We the
> people must do something.    Suggestions?

The above post was accompanied by the image below.



And then on November 7, 2020, he posted:

> I believe it is time for Patriots to rally up in DC.   We've talked the
> talk, now is the time to put action behind our words.   It's not just
> Trump, it's our country.   Our Republic is being stolen, from us and
> our children.   Who's with me?   I've never asked my friends
> to do anything.   SHARE IF YOU AGREE.   MEET ME IN DC.

That November 7 post was accompanied by the image below.



These implied threats of violence continued into December 2020, during the period that

Phipps's Facebook messages indicate he was planning to come to D.C. on January 6, 2021.

In particular, on December 22, 2020, he posted this image:



7

And on December 27, 2020, he posted this image:



2.  <u>Phipps proceeds into the Capitol on January 6, 2021.</u>

Early in the afternoon of January 6, 2021, Phipps walked west down Pennsylvania

Avenue, heading to the Capitol, with numerous other Trump supporters.   He was on the West

Terrace by approximately 2:55 p.m.

Phipps first tried to enter the building through a fire door on the West Terrace that leads

to the Parliamentarian's Door.   A social-media image shown below (Image 1) shows Phipps on

the outside of the fire door, approaching it with numerous other rioters.



Image 1:    *Phipps attempting to enter the Capitol through a fire door*

At about 2:58 p.m., Phipps made entry through that door into the Capitol, as shown in

Image 2 below.



*Image 2:    Phipps's first entry into the Capitol*

However, he only made it a few feet past the doorway.    Only a minute or so later USCP officers succeeded in pushing the crowd back through the fire door and back onto the West Terrace.

Back outside on the West Terrace, Phipps almost immediately attempted again to enter the building, this time through the Senate Wing doorway just a few yards away.    He successfully re-entered the building at 3:01 p.m., as shown in Image 3 below.



*Image 3:    Phipps re-entering the Capitol through the Senate Wing doorway.*

Once inside the building, Phipps walked south through the building to the room known as the Crypt.    He was in the Crypt for approximately 20 minutes, during which he milled about and spoke to other rioters.



*Image 4:    Phipps in the Crypt at 3:24 p.m.*

While in the Crypt, Phipps posed for the photograph below (Image 5).   He later made the photograph his Facebook account profile photo demonstrating his pride in taking part in the January 6 riot.



*Image 5:    Phipps's post-riot Facebook account profile photo*

### 3.   Phipps's Assaults on MPD officers

Phipps left the Crypt at about 3:25 p.m. and proceeded back to the Senate Wing doorway, through which he exited back onto the West Terrace at 3:32 p.m.   About an hour later, a large group of MPD officers in riot gear assembled on the terrace, and walked forward as a group, verbally instructing those rioters still present, which included Phipps, to clear the area.

Phipps initially complied and began to move in the direction indicated by the officers. But after a few moments, Phipps had a change of heart.   As a result, during the period 4:35 p.m. to 4:38 p.m., he assaulted three different MPD officers who were trying to clear the West Terrace.   Phipps's assaults were recorded on the body-worn cameras (BWCs) of multiple officers involve in that effort.   Images 6 through 13 below are all stills from the BWC recording

of Officer K.R., Phipps's second victim, which happened to capture significant aspects of all three assaults.[3]

Phipps's first assault occurred at approximately 4:35:23 p.m., when he turned toward an officer, who has not been identified, and leaned into him and pushed against him with his hands, as shown below.



*Image 6:    Phipps's first assault, on an unidentified police officer*

After a few moments, Phipps separated himself from the officer but remained poised to attack again, facing the officers and not moving away as instructed, as shown in Image 7 below.

---

[3]Prior to sentencing the government will provide the Court with the entire three-and-a-half minute BWC clip that these still images are taken from, in addition to other pertinent recordings.



*Image 7:    Phipps continued to defiantly confront officers after his first assault*

During the next minute or so, the officers managed to push Phipps down to a lower level

of the terrace, and further away from the Capitol building, as shown in Image 8 below.



*Image 8:    Phipps resisted continued efforts by police to remove him from West Terrace*

Phipps, however, immediately climbed back to the higher level, closer to the Capitol building, and within a couple of minutes was once again defiantly staring down the officers, as shown in Image 9 below.



*Image 9:   Phipps repositioned himself closer to the Capitol, despite efforts by police to remove him from West Terrace*

It was a few moments later that Phipps threatened the entire group of officers, telling them: "You know this isn't the end.   You know this isn't over.   This is just the beginner [sic].   This is just the beginning!"

Shortly thereafter, at 4:38:44 p.m., he committed his second assault, on Officer K.R., by once again pushing the officer with his hands and, during this assault, grabbing the officer's baton, as shown in Images 10 (from 4:38:44 p.m.) and 11 (from 4:38:45 p.m.) below.



*Image 10*



*Images 11*

Officer K.R. managed to separate himself from Phipps a moment later.    Officer A.C. then reached out toward Phipps to try to restrain him, as shown in Image 12 (4:38:46 p.m.) below, where Officer A.C. is partially visible on the left side of the frame.



*Image 12:    Officer A.C. tried to restrain Phipps after his assault on Officer K.R.*

Phipps responded by assaulting Officer A.C., his third assault, pushing against him with his hands and arms, as shown below in Image 13.



*Image 13:    Phipps's third assault, against Officer A.C.*

17

After committing that third assault on an officer, Phipps finally complied with the officers' demands and left the West Terrace, and, apparently, the Capitol grounds shortly thereafter.

4.   Phipps' Social Media Posts After January 6, 2021

On January 8, 2021, Phipps boasted about and tried to justify his participation in the Capitol Riot, in this Facebook post:

> Everyone talks about being a Patriot until it's time to do Patriot shit. . . .   I went to DC.   I helped take the Hill.   I helped other Patriots prevent antifa from damaging anything.   I exercised my 1st Amendment right to take grievances to our representatives. Where were you on 06JAN21?

Ten days later, on January 18, 2021, he blatantly lied about his conduct during the riot in this post:

> For those who may be wondering, no, the FBI is NOT after me because I'm on video fighting with antifa and cooperating with law enforcement.   I exercised my 1st Amendment rights.

## III.   THE CHARGES

On December 1, 2021, a grand jury returned a six-count Second Superseding Indictment charging Phipps with the following offenses.   Count One:   Assaulting, Resisting or Impeding Certain Officers (MPD Officer A.C.), with Physical Contact and Intent to Commit Another Felony, in violation of 18 U.S.C. § 111(a)(1); Count Two:   Obstructing, Impeding, or Interfering with a Law Enforcement Officer (MPD Officer A.C.) During a Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); Count Three:   Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); Count Four:   Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); Count Five:   Disorderly Conduct on Capitol Grounds or in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D);

and Count Six:   Parading, Demonstrating and Picketing in a Capitol Building, in violation of 40

U.S.C. § 5104(e)(2)(G).

On May 4, 2023, Phipps pleaded guilty to all six offenses.   There is no plea agreement.

## IV.   STATUTORY PENALTIES

Phipps faces the following statutory penalties for his offenses.

Count One:   Up to eight years in prison, a supervised release term of up to three years, a

fine of up to $250,000, and a special assessment of $100.

Count Two:   Up to five years in prison, a supervised release term of up to three years, a

fine of up to $250,000, and a special assessment of $100.

Counts Three and Four:   For each count, up to one year in prison, a supervised release

term of up to one year, a fine of up to $100,000, and a special assessment of $25.

Counts Five and Six:   For each count, up to six months in prison, a fine of up to $10,000,

and a special assessment of $10.[4]

## V.   SENTENCING GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings

by correctly calculating the applicable Guidelines range."   *United States v. Gall*, 552 U.S. 38, 49

(2007).   As the PSR correctly indicates, the Guidelines apply only to Counts One through Four.

### A.  Phipps's Overall Adjusted Offense Level

As the Guidelines direct in USSG § 1B1.1(a)(1), (2) and (3), the Court must first

determine the appropriate USSG guideline and offense level for each count of conviction for

---

[4]Because Counts Five and Six involve convictions for petty offenses, a supervised release
term cannot be imposed for them.   *See* 18 U.S.C. §§ 19, 3583(b).

which the Sentencing Guidelines apply, including any cross references, specific offense characteristics, special instructions, and adjustments other than acceptance of responsibility. The Guidelines then require the Court to group multiple counts of convictions together as appropriate, *id.* § 1B1.1(a)(4), to determine a total offense level, and then apply any downward adjustment for acceptance of responsibility to determine the overall adjusted offense level, *id.* § 1B1.1(a)(5).

The government generally agrees with the PSR's offense-level analysis that results in an overall adjusted offense level of **18**, which includes the full three-level downward adjustment for acceptance of responsibility.   The PSR writer, however, only calculated the offense-levels for Counts One and Three, presumably because the offense levels for those counts determined the group offense levels for each of the two groups of counts—group 1 (composed of Counts One and Two) and group 2 (composed of Counts Three and Four).   The government agrees with the PSR's determination of the adjusted offense levels for Counts One and Three and with the PSR's grouping and multi-count analysis.

However, the government submits that it is important for the Court to have an offense-level calculation for all four counts covered by the Guidelines, in the event that the Court disagrees with the PSR's grouping and multi-count analysis.   Accordingly, in the view of the government, the adjusted offense levels (prior to considering acceptance of responsibility) for each Guideline-covered count is as follows:   Count One:   20; Count Two:   20; Count Three: 14; Count Four:   14.

### B.  Phipps's Criminal History

The government agrees with the PSR that Phipps has zero criminal history points and is therefore in Criminal History Category I.

### C.  Phipps's Sentencing Ranges

The government agrees with the PSR's calculations that Phipps faces an overall Guidelines range of imprisonment of 27 to 33 months and an overall fine range of $10,000 to $100,000.   The PSR sets out the supervised release term called for by the Guidelines for each Guidelines-covered count, which the government does not dispute.   The government would add that under the Guidelines the overall supervised release range, given that by statute supervised release terms imposed at the same time must run concurrently, 18 U.S.C. § 3583(b), is one to three years.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a significant term of incarceration.

### A.   Nature and Circumstances of the Offense

As shown in Section II B. of this memorandum, Phipps's conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of presidential power, and nearly throwing the United States into a constitutional crisis.   In the weeks leading up to the riot, Phipps made postings on Facebook clearly advocating violence against the government.   On the day of the riot, Phipps's initial attempt to enter the Capitol was repulsed by police but he then simply went to another doorway.   He then remained in the building for over 30 minutes and after exiting stayed on the grounds for over an hour.   He then violently resisted efforts of the police to get him to leave the grounds by assaulting three police officers.

The nature and circumstances of Phipps's offense thus were of the utmost seriousness, and fully support the government's recommended sentence of 33 months in prison.

21

**B.  The History and Characteristics of the Defendant**

The defendant, now 50, was 47 years old at the time of the Capitol Riot.   He has an extensive criminal history involving arrests and convictions for driving under the influence, driving without a valid license and possession of marijuana and drug paraphernalia, committed in four different states when he was in his late 20s and early 30s.   Notably, in two of those cases a warrant was issued for his arrest.   One warrant, issued in 2003, was for his failure to either appear in court or pay a fine; that warrant was dismissed a year later.   The second warrant was issued in 2006 for his failure to comply with probation conditions; that warrant was finally "cancelled" ten years later.   In addition, in 2016 a non-extraditable arrest warrant was issued for him, in Kennesaw, Georgia, for failure to appear.   That warrant remains pending.   Significantly, since the time he was charged in connection with the Capitol Riot, the D.C. Pretrial Services Agency has repeatedly recommended to him that he resolve that warrant.

Phipps reportedly obtained his GED in 1990 and then attended, but did not graduate from, a community college.   He enlisted in the Navy in 1995.   He received a "general discharge under honorable conditions"—as opposed to an honorable discharge—in 1996.[5]   He appears to have only been sporadically employed in the years that followed.   According to the draft PSR, there were long periods of time, from 1996 to 2002 and from 2006 to 2013, where he was not

---

[5]According to the Law for Veterans website, a general discharge under honorable conditions "usually means there was something that prevented the service member from performing their job adequately or from meeting expected standards of conduct." https://lawforveterans.org/work/84-discharge-and-retirement/497-military-discharge.

employed.   He apparently was gainfully employed as a security officer at the time of the riot, but left or lost that job in 2022.

The government submits that the defendant's history and characteristics show a tendency to avoid responsibility for his actions, and therefore provide support for a period of significant incarceration.

**C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor strongly supports a sentence of incarceration for a significant term.   Phipps's conduct on January 6, 2021 was the epitome of disrespect for the law.

**D.     The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed in this case in order "to afford adequate deterrence to criminal conduct" by others.   18 U.S.C.§ 3553(a)(2)(B).   The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[6] The demands of general deterrence weigh strongly in favor of a significant period of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a term of significant incarceration.   As discussed above, Phipps posted calls for violence soon after November 3, 2020, when he quickly came to believe that the

---

[6]*See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

23

country was being "stolen" from him.   After the riot, clearly showing that he had no remorse, he changed his Facebook account profile photo to an image taken on January 6, 2021, showing him standing in the Crypt.   In the days that followed, he claimed that he had merely exercised his "1st Amendment rights" when he participated in the riot.

His willingness to call for violence before the riot, and his lack of remorse afterward, make clear that Phipps's sentence needs to include a significant period of incarceration, in order to provide specific deterrence.

### E.   The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."   *Rita v. United States*, 551 U.S. 338, 349 (2007).   As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'"   *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards."   *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines."   *Id.* at 101.

### F.   Unwarranted Sentencing Disparities

Section 3553(a)(6) of title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully

review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).   In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021).   Consequently, a sentence within the applicable Guidelines ranges will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes . . . I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, 18 U.S.C. § 3553(a).   After all, the goal of minimizing unwarranted sentencing disparities in section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).   The "open-ended" nature of the section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 383 U.S. App. D.C. 278, 282 (2008).   "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant."

*Id.* at 284.   "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances."   *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[7]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly."   *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009) (further holding that "[a] sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[8]

While no previously sentenced Capitol riot case contains the same balance of aggravating and mitigating factors present here, *United Sates v. Cale Clayton*, 22-cr-00139-RCL, where the court imposed a sentence of 30 months' incarceration, and *United States v. Robert Dennis*, 21-cr-00679-JEB, where the court imposed a sentence of 36 months' incarceration, are similar to this case.   In both *Clayton* and *Dennis*, the most serious charges against the defendants were felony violations of 18 U.S.C. § 111(a)(1) and both were also charged with violating 18 U.S.C. § 231(a)(3).   Like Phipps, neither was charged with any additional felonies.   As in this case, in both *Clayton* and *Dennis*, the defendants grappled with and pushed and shoved multiple officers

---

[7]If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct.   *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[8]A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here:   https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES."   The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

in a short series of confrontations on the West Terrace, without using a weapon against them, and without causing physical injury to them.

Pursuant to a plea agreement, Clayton pled guilty to two felony violations of 18 U.S.C. § 111(a)(1) and the remaining charges against him, which included a third felony violation of section 111(a)(1), were dismissed.   *See United Sates v. Cale Clayton*, 22-cr-00139-RCL, ECF no. 26 (plea agreement) at 1-2.   His sentence of 30 months was within his range of imprisonment under the Guidelines (30 to 36 months).   *See id.*, ECF nos. 26 at 4, 35 (judgment of conviction) at 2.

Dennis was found guilty at trial of two felony violations of section 111(a)(1), of violating section 231(a)(3), and of several misdemeanors.   *United States v. Robert Dennis*, 21-cr-00679-JEB, ECF no. 72 (judgment of conviction) at 1.   His Guidelines range of imprisonment was 41 to 51 months' incarceration, but the court varied downward, and imposed a 36 month prison sentence, in part because of Dennis's advanced age (63).[9]   *See id.*, Tr. of 4/13/23 at 19, 21.

The government's sentencing recommendation in this case, 33 months in prison, is half-way between the prison term Clayton was sentenced to (30 months) and the term Dennis was sentenced to (36 months), reflecting the general similarity among all three cases.   In addition, the government's recommendation is appropriately higher than the sentence Clayton received because unlike Clayton, Phipps made entry into the Capitol building itself.   It is appropriately lower than Dennis's term because unlike Dennis, Phipps pled guilty to all counts and accepted responsibility for his conduct.

_____

[9]Dennis's Guidelines offense-level calculation did not include any downward adjustment for acceptance of responsibility.   *See United States v. Robert Dennis*, 21-cr-00679-JEB, Tr. of 4/13/23 at 6.   Also, a third § 111(a)(1) felony charge against him was dismissed on the government's motion, due to witness unavailability.   *Id.*, ECF nos. 69 (Govt. Sentencing Memorandum) at 12, 72 at 1.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case.   Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 403 U.S. App. D.C. 39, 43 (2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 395 U.S. App. D.C. 82, 85 (2011).   First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C.   § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."   *Papagno*, 395 U.S. App. D.C. at 85; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).   Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA.   *Papagno*, 395 U.S. App. D.C. at 85.   The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," *id.* § 3663A(c)(1)(A)(i), or "an offense against property . . . including any offense committed by fraud or deceit," *id.* § 3663A(c)(1)(A)(ii); s*ee Fair*, 403 U.S. App. D.C. at 43 (citation omitted).

Because Phipps was convicted of an offense under Title 18, the VWPA applies.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664.   *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA).   Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury.   *See Papagno*, 395 U.S. App. D.C. at 86; 18 U.S.C. §§ 3663(b), 3663A(b).   Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim.   *United States v. Bikundi*, 441 U.S. App. D.C. 293, 323 (2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate."   *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)).   The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[10]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and because his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," this Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses.   *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's

---

[10]Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process.   *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

general losses"); *see also United States v. Monzel*, 442 U.S. App. D.C. 267, 273-74 (2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Phipps to pay $2000 in restitution for his convictions on Counts One and Two.   This amount fairly reflects Phipps's role in the offense and the damages resulting from his conduct.   Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property.   Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose an overall sentence of 33 months in prison followed by three years of supervised release, structured in the following manner:

Count One:   33 months in prison followed by three years of supervised release;

Count Two:   33 months in prison followed by three years of supervised release;

Count Three:   12 months in prison followed by one year of supervised release;

Count Four:   12 months in prison followed by one year of supervised release;

Count Five:   6 months in prison;

Count Six:   6 months in prison.

The Court should order that both the terms of imprisonment and the terms of supervised release for all of the counts run concurrently.   The Court should also order the defendant to pay a total of $2000 in restitution, for his convictions in Counts One and Two, and to pay the required special assessments for each of the six counts.[11]

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

by:   /s/*Michael C. Liebman*
Assistant United States Attorney
D.C. Bar no. 479562
601 D Street, N.W., room 4.1501
Washington, D.C.   20530

---

[11]The government agrees with the PSR that the Court should not impose a fine.